IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
March 16, 2004 Session

## B. M. M. v. P. R. M.

**Appeal from the Circuit Court for Wilson County**
**No. 3300DV      Clara W. Byrd, Judge**

_____

**No. M2002-02242-COA-R3-CV - Filed August 18, 2004**

_____

This is a child custody dispute. The mother and father entered into a permanent parenting plan naming the mother the primary residential parent of their daughter. Under the plan, the father had supervised visitation because the mother was concerned about sexual abuse by the father. The father later sought to modify the parenting plan to allow for unsupervised visitation. The mother then filed a notice that she intended to move to Florida with the daughter, which the father opposed. The trial court granted the father's petition for unsupervised visitation and denied the mother's request to relocate to Florida with the child. The mother and daughter then left for a scheduled trip to Florida, with the understanding that they would return for the father's scheduled visitation. The mother remained in Florida with the daughter for six weeks, asserting that she, the mother, was too ill to travel. The father was granted an emergency change of custody. The father then retrieved the daughter through a private investigator, coordinating with Florida officials. Upon return to Tennessee, the trial court found the mother in criminal contempt for interfering with the father's visitation and for moving to Florida. The father was named the primary residential parent and the mother was granted supervised visitation. The mother was also required to pay the father for the cost of the private investigator. The mother appeals the denial of her request to move to Florida with the child, the award of unsupervised visitation to the father, the finding of contempt, the change of custody, the requirement that her visitation be supervised, and the requirement that she pay the private investigator's fee. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court is Affirmed**

HOLLY M. KIRBY, J., delivered the opinion of the court, in which W. FRANK CRAWFORD, P.J., W.S., and DAVID R. FARMER, J., joined.

Paula Ogle Blair, Nashville, for the appellant B. M. M.

Andrew M. Cate, Nashville, for the appellee P. R. M.

**OPINION**

Appellant B. M. M. ("Mother") and Appellee P. R. M. ("Father") were divorced by final decree on January 29, 2001. At the time, the parties agreed on a "Permanent Parenting Plan" concerning the parties' then six-year-old daughter, Chrissy, which was incorporated into the final decree. Under the parenting plan, Mother was named the primary residential parent and Father was granted supervised visitation, subject to subsequent modification by mutual agreement. Mother had insisted on the supervised visitation based on her belief that Chrissy was at risk for sexual abuse by Father. Mother's concerns about possible sexual abuse arose from Father's viewing of internet pornography, and Mother's interpretation of games Father played with Chrissy as having sexual overtones.

On October 5, 2001, Father filed a petition to modify the parenting plan to permit unsupervised visitation with Chrissy. In the petition, Father maintained that there had never been any justification for having his visitation supervised, but that he had agreed to the restriction only because Mother assured him that she would later permit overnight, unsupervised visitation. Father alleged that, rather than loosening the restrictions, Mother increased them, so he sought court permission for unsupervised visitation. The trial court issued an order for Mother to show cause why Father should not have unsupervised visitation. In her response, Mother alleged that Father should not be permitted unsupervised visitation because he "suffers from paraphilia and sexual addiction and . . . Father's inappropriate behavior, including his behavior with or in the presence of the child, makes [unsupervised visitation] inappropriate." Mother also asserted that there had been no change in material circumstances to justify modifying the agreed-upon parenting plan.

Shortly thereafter, on October 25, 2001, Mother sent Father notice of her intent to relocate to Florida with Chrissy, pursuant to section 36-6-108 of the Tennessee Code Annotated. In the notice, Mother said that she and Chrissy had lived in Tennessee with Mother's mother, Lee M. ("Grandmother"), and that Grandmother was moving to Florida for work. Mother asserted that she depended on Grandmother to help pay for utilities and repairs to the residence as well as clothes for Chrissy. Mother also contended that Florida had better home schooling opportunities than were available in Tennessee. After receiving the notice, Father filed a petition opposing the move on November 30, 2002, maintaining that there was no reasonable purpose for the move, that Mother had vindictive purposes for the move, and that the move to Florida posed a threat of specific and serious harm to Chrissy. On December 17, 2001, Mother filed an answer to Father's petition opposing her relocation to Florida with Chrissy, denying any grounds for Father's opposition to her move.

A trial was conducted on the issues of Mother's proposed relocation and Father's petition for unsupervised visitation. Most of the testimony was heard on May 22 and June 19, 2002. Regarding the proposed relocation, Mother testified that she wanted her and Chrissy to move to Florida with Grandmother, because she relied on Grandmother "physically and emotionally," and because Grandmother helped pay bills and watch after Chrissy. Mother believed that Chrissy's relationship with Grandmother was as important as Chrissy's relationship with Father. Mother admitted, however, that she was not financially dependent on Grandmother. Mother testified that, in addition

to child support, Mother earned between $34,000 and $35,000 per year performing medical transcription, which she did from her home. Mother said that she did not have worker's compensation or insurance benefits from her work, but she had access to VA doctors and received $100 per month in VA benefits.

Chrissy testified as well. Chrissy was asked about her relationship with Father and the contemplated move to Florida. She said that, under the parenting plan, she visited Father often enough, but that "a lot of times I'll be really looking forward to seeing him because I really miss him." When asked about the possibility of seeing Father less often, she responded, "I wouldn't really like it, because I really miss him." She testified: "If I moved to Florida I would want to see him at least as often as I—at least as often as I could. . . . "

After hearing the testimony on this issue, the trial court denied Mother's petition to relocate to Florida with Chrissy. The trial court found no reasonable purpose for the move, reasoning that Mother did not need Grandmother's support to raise Chrissy:

> The mom has a home here, friends here, a job. She makes 34,000, 35,000 a year. . . . She can work when she wants to or at night when the child is in bed. She's got VA benefits and got a VA hospital right here. . . .
> * * *
> [B]asically you're in better financial circumstances right here than 99 percent of the single moms or single dads that I have come before this Court.

The trial court also heard testimony regarding Father's petition to modify the parenting plan to permit unsupervised visitation. In her testimony, Mother maintained that supervised visitation was necessary because Chrissy was at risk of sexual abuse from Father. Mother said that she had told Father that she was only willing to lift the visitation restrictions if she became convinced Chrissy was in no danger, and that Father's seeking counseling was only a first step to alleviating her concerns. She testified that she first became concerned for Chrissy's safety when she discovered that Father had been viewing pornography on the internet, some of which she believed included child pornography. She introduced into evidence photographs and graphics from their computer's temporary internet files. According to David Collinsworth ("Collinsworth"), who testified as a computer expert on behalf of Mother, temporary internet files are text and graphics from internet pages automatically saved on computers after being viewed on the internet. Although the files did not directly indicate that children were in the pornographic photographs, Mother believed that some of the subjects looked young enough to be underage.

Mother testified that, after she discovered that Father had been looking at internet pornography, she reevaluated activities she had observed between Father and Chrissy during the marriage, and had come to suspect that those activities had underlying sexual connotations. She recalled games in which Father and Chrissy pretended to be animals and licked one another in various places and sniffed each other's ears. In her deposition, Mother testified about an incident

-3-

in which Father was blow drying Chrissy's hair and he pulled back her underwear, pointed the hair dryer down her back and said "hot pants."

Mother objected to a number of Father's activities with Chrissy during his supervised visitation. Father and Chrissy built tents and forts with blankets and furniture, a game, Mother implied, which Father orchestrated in order to hide inappropriate conduct. Mother asked them to stop building tents and forts. Mother said that the animal games that occurred during the marriage continued; Father and Chrissy apparently played a game in which Chrissy was a stray dog and Father would catch her and put her in the dog pound. Mother told them to "stay out of the dog pen." Mother objected to Father and Chrissy sword fighting, playing Peter Pan and Captain Hook, since she considered it to be inappropriate. On one occasion, Father and Chrissy had been playing in the back yard while Mother sat in the back yard reading a book. When Mother went to the bathroom, Father took Chrissy to some nearby woods, where they were unsupervised for five to ten minutes. After Mother came back from the bathroom, she yelled repeatedly, and they returned.

In one incident, Father and Chrissy were in the back seat of the car after a shopping trip to the mall, and Chrissy complained of her legs being tired or sore. Mother then observed Father massaging Chrissy's upper thigh as she said "ooh" and "ah." Mother, in the front seat, pointedly cleared her throat, and Father stopped. Grandmother told Mother than she once observed Father massaging Chrissy's bare back and pelvic area as he tucked her into bed; thereafter, it was arranged so that Father would no longer tuck Chrissy into bed. Mother told Father that it was inappropriate for him to rub Chrissy's legs and maintained that Father should not touch Chrissy in any way that he would not touch a neighbor's child.

Mother admitted that she had told friends that Father was "in kiddy porn" and that she had told Father's family that he had touched Chrissy inappropriately. She reported to the police that Father had been viewing child pornography. She acknowledged that, in the past, she was raped by her first husband and beaten to the point that she required reconstructive surgery. Mother said she chose to home-school Chrissy because Chrissy had been tested and found to be a gifted child, and Mother felt that gifted children in public schools were frequently bored.

Father presented testimony from his first wife, Rebecca M., to whom Father was married for six years and who was the mother of Father's son, Ben, Chrissy's half-brother. Father and Rebecca M. shared joint custody of Ben. Rebecca M. testified that Father was an excellent parent to Ben, very patient, mellow and easy-going, and that she never saw any inappropriate behavior toward Ben or any other child. She had been told the allegations that Father was interested in child pornography and that he had engaged in inappropriate conduct with Chrissy. She commented, "I bet you a million dollars that none of that's true," and said that she would "stake my life" on the fact that he was a great father.

The trial court also heard testimony from Father's son, Ben, a fifteen-year-old honor student. Ben said that he had a good relationship with Father, that he and his friends would play sports with Father, and that he was "really fun to be with." He said that Father and Chrissy had fun playing

together, and Father tucked Chrissy in at night, with no inappropriate behavior. Ben observed that Chrissy always loved being around Father. Ben said that he had a good relationship with Chrissy and he would like to see her more often. Ben described his relationship with Mother, his step-mother, as "uneasy," and said that when Mother and Father were married, Ben and Mother did not get along. He characterized her as "controlling and strict," and said that Mother criticized him as "irresponsible" and "a bad influence on Chrissy." Ben testified that Mother was "very paranoid about how Chrissy might get hurt or how people might take advantage of Chrissy."

Father also testified. Initially, he explained that as his marriage deteriorated, Mother belittled and demeaned him, and their sexual contact greatly diminished. As a sexual outlet, approximately a year before the parties divorced, he began viewing pornography on the internet. He was "not real proud" of having done it. Father denied viewing or searching for child pornography. He acknowledged that a number of the temporary internet files retrieved by the computer expert, David Collinsworth, had references to subjects who were "young" or "teens," but said that these were links or headers to pornography sites that he did not necessarily access.[1] He acknowledged having accessed a few that involved bestiality, out of curiosity. Father said that he agreed to the parenting plan, which provided for supervised visitation, because he was upset at having failed at another marriage, he was demoralized by Mother's belittling of him, and because Mother had threatened to publicly expose his viewing of pornography. He said that Mother promised him that, if he would see a counselor, she would relax the restrictions on his visitation. Father obtained counseling from a psychologist, as agreed, but Mother increased, rather than decreased, the restrictions. When Father confronted her, Mother refused to consider relaxing the restrictions.

Father flatly denied ever sexually abusing Chrissy. Father testified that he massaged Chrissy on her back, stomach, and legs to help her sleep, and had done so since Chrissy was a baby, but that he never touched her genital area. Father maintained that it was not inappropriate for him to massage Chrissy in a way that he would not massage another child. He denied that the games he played with Chrissy were for sexual gratification and said that Mother had no objection to them prior to learning that he had been viewing pornography. Father suggested that Mother had a history of overreacting to seemingly benign circumstances and said that, after she learned of the pornography, she began putting a "sexual spin" on innocuous behavior.

Father recounted a number of incidents in which he said Mother overreacted or read sexual overtones into harmless activities. When Father and Chrissy made blow guns out of construction paper and tape and accidentally knocked over a drink, Mother put an end to their game and asked Chrissy ominously, if this was the sort of game she would play with her friends? Mother objected to the game in which Father was the dog catcher and Chrissy was the stray dog and the dog catcher would catch her when she sneaked out. Mother said it was not appropriate to put Chrissy in the dog pen and admonished Chrissy repeatedly, "Is this the sort of game you would play with your friends?"

---

[1]Collinsworth also testified that, although all of the pictures and graphics he retrieved had appeared on the computer screen, only one of the files that Mother asserted may have had underage subjects indicated that the computer user intended to view it. The remainder were banners or "thumbnail" links to other web sites.

Mother objected to Chrissy and Father making tents and forts with blankets and chairs, because Mother believed Father used this method to get alone with Chrissy, out of Mother's sight. Mother disapproved of Father and Chrissy playing Peter Pan with toy swords and hats, because it was too violent. She thought it was inappropriate for Father and Chrissy to pretend to be animals and sniff each other's face or ears, because she believed Father was doing this for sexual gratification. Father said that they pretended to lick each other's face or ears, but did not really lick, and that they did not sniff rear ends as dogs do. After a trip to the mall, Chrissy complained that her legs were tired, and Father said that he, in the back seat with Chrissy, "lightheartedly" massaged the top of her leg, and Mother objected. In the incident with the hair dryer, Father said he was drying Chrissy's hair and playfully pulled the back of her panties and blew the hair dryer and said "Hot Pants," and Chrissy giggled. He was unaware of Mother's objection until her deposition. On one occasion, Father took Chrissy out of the back yard to look at some nearby construction, and Mother became very upset. When Father signed up to go with Chrissy on the father/daughter camping trip organized by Chrissy's home-school co-op program, Mother told persons associated with the program that Father had been viewing child pornography, and, according to Father "they quickly decided that I was unfit to go on that trip."

Father testified that Mother treated his son Ben "poorly" and was overprotective of Chrissy. Mother felt that Ben was "a delinquent" and "a bad influence on Chrissy." Mother became very angry when Ben let his mother into their house to see his Halloween pumpkin, because of her concern that Ben's mother might do something to Chrissy.

Father said that Mother chose to home-school Chrissy in part because she did not want Chrissy influenced by the type of children in public schools. Father said that Mother usually signed up to teach Chrissy's Sunday School class, and seemed unwilling to let Chrissy out of her sight. Father was concerned that Mother's overprotectiveness of Chrissy limited her experiences, and that the restrictions on Father's visitation with Chrissy made his contact with her "artificial." He thought that Mother communicated to Chrissy a distrust of men in general, resulting in part from Mother's abusive first husband. Father denied any inappropriate conduct with Chrissy and sought standard, unsupervised visitation.

At the conclusion of the testimony on June 19, 2002, the only testimony remaining was expert psychological testimony. At that point, the trial judge told the parties:

> Well, at this time I find no reasonable purpose for the move to Florida. The mom has . . . an ideal situation here. . . . There is no way she could make this move at this time without totally alienating this child from her daddy. . . . I'm going to reserve any findings on whether or not I think this is a total attempt to alienate the child from the father or whether I think the move is vindictive. I'm reserving those findings at this time, because I do want to see what the psychologicals show. . . . I really don't know that supervision is necessary anymore, but I'm going to let [the expert] finish her recommendation and see. . . .

Thus, the trial court at that juncture told the parties that she was inclined not to permit Mother to move to Florida and that she did not see a need to have Father's visitation with Chrissy supervised. The testimony resumed on August 2, 2002.

The trial court heard testimony and received a report from an expert appointed by the court to evaluate Chrissy, Dr. Lisa Dupree ("Dr. Dupree"), who also worked with the Tennessee Bureau of Investigation on identifying child pornography. Dr. Dupree commented on the pornographic images admitted into evidence, noting that, although there were some photos in evidence that depicted subjects whose age was questionable, the pornography submitted into evidence did not depict any prepubescent children. Dr. Dupree also explained the difficulty of identifying underage pornography on the internet. She noted that "virtually every pornographic site that we have seen has some advertisement of teens." She suggested that it would be nearly impossible to view any pornography on the internet without encountering some mention of teens. She also noted:

> There are virtually no internet sites that don't talk about teens. . . . The reality is that . . . a male with normal sexual arousal is going to have sexual arousal to teens because they have secondary sexual characteristics. . . . So that is not a deviant behavior. That is actually normal sexual arousal. . . . [though] it's inappropriate and it's exploitative.

Dr. Dupree's report noted that Father had admitted to two isolated incidents of sexually deviant behavior as a teenager, one involving a young child and the other involving a sexual interest in animals. Though Father fit no sexual offender profile, these incidents, along with some bestiality internet files in evidence, raised some concerns. She noted that zoophilia is found in "a significant minority of sex offenders who engage in incest-only offending." However, the research involved those incarcerated or already identified as abusers, "[s]o it certainly is not totally appropriate to generalize that to the entire population." She testified that these factors raised some concerns but were not predictors of future abuse:

> I'm not comfortable saying that even rises to the level of a DSM diagnosis. But just the interest [in bestiality] that's there and other history of the younger child, even though that was sometime ago, those two things, again, they just increase my level of concern. It's not a predictor.

Dr. Dupree said that she talked with Father about his massaging Chrissy under her nightgown to help her go to sleep and that Father categorically denied that the massages were sexual in nature. She was asked whether she had an opinion on whether the massages were appropriate, and she responded that there was no way for her to know whether Father's intent was sexual or "grooming in nature." She defined grooming as "desensitizing a child to touch, you know, putting a child in a situation where something normal is going on and then moving it to a situation that's uncomfortable or a violation of boundaries," and observed that such grooming "tends to happen slowly over a period of time with sex offenders and children." Dr. Dupree said that, based on all of the information she had, even

though Father's past raised the level of concern higher than it would have been for someone without Father's past, Dr. Dupree did not predict that Father would abuse Chrissy.

In her report, Dr. Dupree stated that she found no evidence of child abuse. She noted that Grandmother, who had testified that she saw Father touching Chrissy's pelvic area, was not sure if Father actually touched the genital area. Although Chrissy categorically denied Father had ever touched her genitals, Dr. Dupree observed that Chrissy indicated a fear that Father would touch her in inappropriate places. Dr. Dupree said that Mother had told Chrissy that she had found "dirty pictures" on Father's computer, and that Chrissy told Dr. Dupree that, after she learned this, Chrissy began to worry that Father might touch her in private places. Chrissy was aware that her visits with Father were supervised in order to protect her from the possibility of Father touching her inappropriately. Dr. Dupree told Mother that she felt it was inappropriate for her to discuss these types of things with Chrissy.

Dr. Dupree also noted that Mother decided to bring Chrissy to the Rape and Sexual Abuse Center for counseling and that she disagreed with this decision. She observed that there was nothing to support the conclusion that sexual abuse had occurred, and that research indicates that it is ill-advised to put a child in therapy for sexual abuse where there has been no finding of such abuse. Dr. Dupree was concerned that Chrissy's anxiety was picked up from the adults who surrounded her. Moreover, prior to Chrissy's visit to the Rape and Sexual Abuse Center, Mother told Dr. Dupree that she did not believe Father had sexually abused Chrissy, that Mother was simply seeing behaviors that concerned her. After Mother took Chrissy to the Center, however, Mother's view changed, and she became convinced that Chrissy had in fact been abused.

Under these circumstances, Dr. Dupree predicted that at least an allegation of abuse was likely without intervention. This prediction was not based on Father's behavior but rather on Mother's apparently genuine belief that sexual abuse had occurred; this meant that Mother would likely be more aggressive in looking for sexual abuse in the future. Dr. Dupree testified that the likelihood that Mother would allege abuse in the future presented a problem:

> [J]ust going to a place called the Rape and Sexual Abuse Center sends this child a message about her experience and tells her what her experience is. Whether indeed that's real or not isn't even considered. . . . I am very concerned that without effective family intervention . . . at some point there will be another allegation. And if this child has been in therapy for sexual abuse for an extended period of time, it may be impossible to accurately access [sic] or investigate a future allegation of sexual abuse because of prior treatment that may well be contaminating . . . any information you might receive.

Thus, Dr. Dupree was concerned that if Chrissy continued to be treated as if she had been abused, in the absence of evidence to the contrary, it would be impossible to determine the legitimacy of any potential future allegations. Dr. Dupree added that Chrissy's response to Mother's behavior could cause further problems in managing the situation: "It appears that [Chrissy] experiences her mother's

anxiety as her own regardless of whether there is actual danger to her." Dr. Dupree did not rule out the possibility that the anxieties Mother passed to Chrissy were the result of Mother's own personal issues:

> It may be that [Mother] has recognized that her daughter is in danger and her reaction is defensive in nature. . . . It is also possible [Mother] is reacting to perceptions of danger that are related to her own personal issues rather than some real danger to her daughter. Based on information gathered during the assessment, both scenarios must be considered equally possible.

Dr. Dupree summarized her findings: "At this time sexual abuse is not found to be present. However, this child appears to be at increased risk for sexual abuse. It is also clear that an allegation of sexual abuse in the future is likely." Thus, Dr. Dupree made recommendations "designed to reduce the risk of sexual abuse . . . and to reduce the risk of a false allegation or an allegation that can't be accurately assessed in the future." She recommended family therapy counseling for Chrissy in a setting that would involve both Mother and Father. She also recommended individual counseling for Mother and Father. Dr. Dupree urged that Chrissy's counseling at the Rape and Sexual Abuse Center be terminated. She did not comment on whether Father's visitation with Chrissy should be supervised.

At the conclusion of the testimony on August 2, 2002, the trial court issued an oral ruling. Initially, the trial court reiterated its June 19 ruling that there was no reasonable purpose for Mother's proposed move to Florida, and denied her request to relocate with Chrissy. The trial court next reviewed the witnesses' testimony in some detail. It then granted Father's petition to modify the parenting plan to permit unsupervised visitation. The trial court found that there was no evidence showing Chrissy had been sexually abused. The court stated:

> I find no reason for the visitation to be supervised. And I find [Father] to be a very credible witness, and I believe him when he says he hasn't abused this child. I believe this child when this child says he hasn't molested her. And I rely upon the experts. And I see absolutely no reason for this father to be denied standard visitation. And I certainly don't believe it's in this child's best interest. In fact, I believe it's a danger to her mental health to continue this supervised visitation based on the record I have and what the witnesses have stated.

The trial court commented on the harm that the supervised visitation inflicted on Chrissy:

> . . . I just believe this supervised visitation has done nothing but harm to this child, because she is being sent the message that she can't be trusted alone, that her father can't be trusted alone, and they're living their entire visitation under a microscope. . . . I've had the psychologicals prepared on [Father], and [the expert] did not find anything there at all to indicate that he had ever abused this child or would ever abuse this child. The only questionable act he's ever done has been whatever act he

indicated that maybe he did when he was a teenager. But [Father] is in his 40s now. And since then he's raised one 15 year old that's just turning out excellent.

The trial court ordered that the therapy at the Rape and Abuse Center be immediately discontinued, and ordered counseling with a psychologist recommended by Dr. Dupree. The trial judge stated:

My concern is this thought has been put in [Chrissy's] mind that she and her dad have an improper relationship, and I think that's not fair to this child. She shouldn't look on their games as being dirty. This child needs to feel that she is loved by both of her parents, that she is safe with both of her parents, because they haven't been anything but good to her. And it's a shame if we've come to the point in time where you can't rub a child's back without being accused of inappropriately touching your child. . . . That's what parents are for.

Accordingly, the trial court lifted the restrictions on Father's visitation and denied Mother's request to stay the order pending appeal. The written order denying Mother permission to move to Florida and removing the restrictions on Father's visitation was not entered until September 3, 2002.

Immediately following the conclusion of the August 2, 2002 proceedings, Mother took Chrissy on an agreed-upon trip to Florida to see Grandmother, with the understanding that they would return on August 9 in time for Father's first scheduled overnight visitation with Chrissy. But it was not to be.

For the trip to Florida, Mother packed Chrissy's school books, her dog, several stuffed animals, several changes of clothes and pairs of shoes, and children's books. At about the same time, sometime during the first week of August, Mother turned over possession of her Tennessee home to a third party under a lease-purchase agreement which she apparently had entered into on June 18, 2002. The lease-purchase agreement had originally been contingent upon the trial court allowing her to move to Florida with Chrissy, but Mother apparently waived that contingency. When they left for Florida, Mother left in her Tennessee home personal property such as furniture and clothing, which the tenants placed in storage. In Florida, Grandmother was living in a home which had Mother's name on the title. When Mother and Chrissy arrived in Florida, they stayed in this home with Grandmother. While Mother and Chrissy were in Florida, Chrissy's home-schooling continued and she began participating in activities with the Florida home-school co-op in the area. Mother and Grandmother dyed Chrissy's hair a lighter color.

In the days leading up to his scheduled August 9 visitation with Chrissy, Father tried unsuccessfully to call Chrissy. On August 5, 6, and 7, he called both Mother's cell phone and Grandmother's home phone and reached no one. On August 8, Mother answered the phone and told him she was sick and unable to return Chrissy to Tennessee for the August 9 visitation. Mother called Father on August 10, and told him that she was on medication and unable to drive. When Father asked to speak with Chrissy, Mother told him Chrissy did not want to speak with him and disliked talking with him on the phone. On August 13, the date of Father's next scheduled visitation,

Father went to Mother's Tennessee residence. The tenants, who were at the home, informed Father that Mother and Chrissy no longer lived there.

Father then made plans to go to Grandmother's home in Florida to get Chrissy and bring her to Tennessee for his visitation. Due to the circumstances, Father planned to bring with him an associate pastor from his church. On August 21, Father was finally able to reach Mother by the telephone. He discussed the planned trip with her, gave her the flight information, told her the associate pastor would be with him, and asked her to bring Chrissy to the airport. Mother objected to Father bringing the associate pastor and refused to take Chrissy to the airport. She subsequently called the senior pastor of the church, as well as the church's district office. She told them Father might engage in inappropriate sexual conduct with Chrissy, sent them excerpts from Dr. Dupree's report, and threatened to sue the church if the associate pastor accompanied Father. Father cancelled his travel plans.

During this time period, roughly the latter part of August or in September, Grandmother flew to Tennessee to retrieve items from the Tennessee house. The tenants living in Mother's Tennessee house loaded a truck with furniture and belongings and Grandmother drove it to Florida. During Grandmother's trip to Tennessee, Mother and Chrissy remained in Florida. There is no suggestion in the record that Father was told at the time that Grandmother was traveling to Tennessee.

Father maintained that, during this time, he was not permitted to speak to Chrissy on the telephone, and that when he reached Mother or Grandmother on the telephone, he was told either that Chrissy was not there or that she did not want to talk to him.[2] On August 28, Father called and Grandmother answered the telephone. He asked to speak to Chrissy and was told that Chrissy did not want to speak with him. When Father questioned this, Mother, in the background, asked Chrissy loudly, do you want to speak to your father? Chrissy responded no. This was repeated, this time apparently closer to the telephone, and then the telephone was hung up.

Father called the Florida home again on September 5 to speak with Chrissy. Father tape-recorded the conversation:

Grandmother: "Hello."
Father: "Hi, Lee. It's [Father]. Could you put" --
Grandmother: "Can you hold just one moment?"
Father: "Sure."
Grandmother [talking into cell phone]:
"Aunt Reeny, I've got to go. I'll give you a call back
later, maybe tonight. Yeah, it's the a_ _hole."
* * *

---

[2]When asked in her later testimony whether she talked to Father while she was in Florida, Chrissy said "Uh-huh."

Grandmother (to Father): "Yes, okay. I'm with you. Yes?"

Father: "I'm calling to talk to Chrissy."

Grandmother: "I'm sorry. Chrissy is not here anymore."

Father: "Could you tell me how I could get a hold of her, please."

Grandmother: "Actually, I don't know. I have no idea where she is. I don't know where [Mother] is, but they're no longer here. They left."

Father: "Okay. Do you know if they came back up here [to Tennessee]?"

Grandmother: "I haven't the foggiest idea."

Father: "You don't know? Well, okay. Well, that's really interesting."

Grandmother: "It really is, but I'll tell you something, [Father]. Don't bother me any more. Okay. I don't need to be bothered by a perverted a_ _hole, piece of dog s_ _t, and that's, basically, what I think of you. So don't bother me. Don't come near me. Don't come after me. Just don't bother me because I don't associate with the type people you are."

Father: "That's fine."

Grandmother: "Okay?"

Father: "As long as you aren't lying to me and —"

Grandmother: "Listen. Don't you ever call me a liar again, you son of a b _ _ ch , or I'll be back to Nashville after your damn a_ _"

Father: "That's fine. You're harboring someone who is breaking the law."

Grandmother: "I'm not harboring anybody. Let me tell you something. If somebody wants to break the law, let me tell you, you come near me, I'll show you what kind of law can be broken, you piece of dog s_ _t. That's the only thing you are. You've been the cause of nothing but grief both for my daughter and my granddaughter."

Father: "Yeah, that's what you say."

Grandmother: "Yes. Let me tell you, man."

Father: "There's nothing you have to say to me. Good-bye."

Grandmother: "Yes. Good-bye. Don't ever bother me again, ever, because if you do, I'll have your f_ _ _ing a_ _ in jail."

At that point, then, Father did not know where Mother and Chrissy were. Not surprisingly, he did not call Grandmother's Florida home again.

Not long after this, on September 10, 2002, Father filed a petition for contempt with the Tennessee trial court. Reciting many of the above facts, he asserted that Mother had in fact moved to Florida in defiance of the trial court's order, that she was preventing him from exercising his court-ordered right to visitation, and that he had been unable even to speak with Chrissy by telephone since August 21. In addition, based on Mother's alleged intentional interference with his and Chrissy's relationship, Father requested temporary emergency custody and an eventual permanent designation as primary residential parent. On September 11, the trial court issued an order granting Father emergency custody of Chrissy.

Right away, Father set about hiring private investigators in Florida to locate Mother and Chrissy. Within a few days, the private investigators learned that Mother and Chrissy were in fact still living with Grandmother. Father had the private investigators conduct surveillance on Grandmother's home and on Mother's and Chrissy's comings and goings during the day every day, while the lawyers worked on getting the Tennessee order for emergency custody domesticated in Florida. This process took approximately two weeks. Father then flew down to Florida, met with his Florida lawyer to finalize the orders, coordinated with the local Florida sheriff's department and met with the private investigators. On September 26, as Father and the private investigators waited in separate vehicles a short distance from Grandmother's home, a sheriff's deputy attempted to serve the domesticated order on Mother, by knocking on the door of Grandmother's home and by telephoning her home as well. There was no answer to either. The sheriff's deputy then left and Father and the private investigators continued the surveillance of Grandmother's home.

After some time, Grandmother came out of the house and looked around. She then got in Mother's car, in the garage, drove around the neighborhood briefly and returned. Soon after that, Mother and Chrissy emerged, got in Grandmother's car, a Ford Mustang, and drove away from where Father and the private investigators were parked. Father contacted the sheriff's department and the private investigator started his vehicle and drove behind Mother and Chrissy in the Mustang. Shortly, Grandmother, in Mother's car, pulled in behind the private investigator's vehicle. With Father's vehicle last in line, all of the cars began winding their way through the neighborhood and onto the main road. While on the main road, Grandmother got her vehicle behind the Mustang, which Mother was driving, and bumped the private investigator's vehicle twice to prevent him from going around her. A sheriff's car then began pursuit, and the car that Grandmother was driving swerved at Father's vehicle, forcing it temporarily off the road. The Mustang then pulled into a dead-end street and the pursuit ended. Grandmother protested that the sheriff's deputies should not give Father custody of Chrissy because he was a danger to her. The private investigator alleged to the deputies that Grandmother had intentionally struck his vehicle with hers, and Grandmother was placed in handcuffs and put in the police car. Father then obtained custody of Chrissy.

After Father returned with Chrissy to Tennessee, he enrolled her in a local school and brought Chrissy to see the counselor ordered by the trial court. After Father gained custody of Chrissy,

Mother spoke with Chrissy by telephone virtually every day. In the middle of October, 2002, Mother returned to Tennessee and moved into a somewhat smaller house while continuing to lease out her original Tennessee home. Pending the hearing on Father's contempt petition and his petition for a permanent change of custody, the trial court ordered supervised visitation for Mother at Father's discretion. Mother visited with Chrissy at the Exchange Club and attended Chrissy's school activities such as cheerleading practices and basketball games. Mother also met with school officials and Chrissy's teacher.

During this time period, Father tape-recorded Chrissy's telephone conversations with Mother and Grandmother. In the telephone conversations, Mother and Grandmother asked Chrissy repeatedly if she was ready to "come home" and told her that they were working to get her "home." Mother also asked Chrissy if anyone had tried to touch her inappropriately. Mother advised Chrissy to throw temper tantrums in public places if Father resisted letting her talk to Mother on the telephone. Mother told Chrissy that Father was trying to have her put in jail. Moreover, a copy of Dr. Dupree's earlier report was sent to the principal of Chrissy's school by an anonymous "concerned citizen."

The hearing on the contempt charge and Father's petition for a permanent change of custody was held November 13-14 and December 10, 2002. At the hearing, both Mother and Grandmother testified, offering innocuous explanations for their actions. Mother claimed that she had gone to Florida for vacation only, and that she had planned to bring Chrissy back to Tennessee on August 9, the day of Father's scheduled visitation. Mother acknowledged that Chrissy was involved in home school co-op in Florida, but explained that she was only involved in their social activities, and noted that, on August 27, she had enrolled Chrissy in a Tennessee home school program. Mother also pointed out that after she arrived in Florida, she had made an appointment for Chrissy with the Tennessee psychiatrist for August 14, pursuant to the trial court's order, although the appointment was later cancelled. Grandmother testified that Chrissy always packed school books, her dog, toys, and numerous clothes and shoes on trips. Mother explained that the house in Florida was in her name only because Grandmother had had a bankruptcy in the past, and Mother qualified for a lower interest rate. Although Mother technically made the down payment, the money for the down payment had come from Grandmother. Mother testified that, although the trial court denied her request to move with Chrissy to Florida, she went ahead with the lease-purchase agreement on her Tennessee home because she wanted to downsize to a smaller home. Mother asserted that during the litigation, she had been looking for a new, smaller place in Tennessee, and when she left for Florida she "had a new place in mind." Mother claimed that the furniture that was moved to Florida belonged to Grandmother, not to her. She said that her own furniture remained in storage in Tennessee so that it could be moved to a new home in Tennessee. Mother said she and Grandmother changed Chrissy's hair color only because Chrissy wanted her hair "done the color of Mary [K]ate and Ashley" (teen celebrities) and asserted that it did not drastically alter Chrissy's appearance.

Mother testified that she had no purpose or intent to violate the trial court's order. She said that Grandmother had moved to Florida in October 2001, and said that she made Father aware well in advance of her plan to visit Grandmother at the conclusion of the hearing. Although she planned

to bring Chrissy back to Tennessee on August 9 for her visitation with Father, Mother testified that she became ill. She said that she experienced diarrhea, nausea, vomiting, muscle jerks and twitches, and severe headaches that caused vision disturbances. Mother sought medical help and, on the day she had been scheduled to return with Chrissy to Tennessee, she was sedated by powerful prescription medication, including Xanax, and stayed in bed for a couple of days. She told Father by telephone of her illness, and told him that her symptoms and the medicine made it impossible for her to drive Chrissy to Tennessee, and that she did not know when she would be able to do so. Over the course of the next two months, Mother said, she saw medical professionals at least fifteen times. She said that, at one point, her condition began to improve, but then deteriorated again around the middle of September. Grandmother testified that Mother tried several times to pack up and return with Chrissy to Tennessee, but that Mother would cry, shake and hyperventilate, and would end up at the doctor's office again.[3] Mother acknowledged that she was "devastated and terrified" after the trial court's order awarding Father unsupervised visitation, and that she had "very real concerns" about Chrissy's safety. She said that nothing she had heard had diminished her belief "that something might have happened to Chrissy." In Florida, when she thought of these firmly-held beliefs, she became ill.

Mother acknowledged that, while Chrissy was in Florida, Chrissy rarely spoke by telephone to Father, perhaps only once. She said that this was because Chrissy did not want to talk to Father. Mother was asked about her efforts to get Chrissy to talk to Father. At first, Mother said, she was "not up for" a fight with Chrissy over the issue. Mother said that later, however, she tried to make Chrissy talk to Father. Mother said that she and Grandmother physically carried Chrissy to the telephone and held the phone up to Chrissy's face. She testified that Chrissy "went just absolutely board rigid and . . . turned white in the face." Chrissy did not talk to him.

In her testimony, Grandmother was asked about the telephone conversation with Father in which she told him Chrissy was not there anymore. At this point, Grandmother was apparently unaware that the conversation had been tape-recorded. She said she came home from work that day and Mother and Chrissy were not there. She said that when Father called, she told him that they were not there, that she did not say that they were not there "anymore." Grandmother testified that Father immediately responded by calling her a liar and accusing her of harboring a criminal and that he "kept pressing" her. She acknowledged calling him a rude name and said she told him, "I prefer you don't call me." When confronted with the tape of the conversation, Grandmother acknowledged that she had in fact told Father that Chrissy was not at her home "anymore" and that she responded to Father's rather civil inquiries about Chrissy with foul language. Grandmother claimed that, when Mother and Chrissy later returned, Mother called Father and told him that they were at Grandmother's house.

---

[3]Mother and Grandmother asserted that they had talked to a retired friend in Kentucky about the friend's planned visit to Florida in October and inquired about getting the friend to assist Mother in bringing Chrissy back to Tennessee in October, some two months after Father's scheduled August 9 visitation.

Grandmother admitted that she had traveled to Tennessee while Mother and Chrissy were in Florida, and said that she could not bring Chrissy to Tennessee for her scheduled visitation with Father because Mother's anxiety and fear from having to turn Chrissy over to Father caused Mother's illness. Mother also acknowledged that Grandmother could have brought Chrissy to Tennessee, but said that Grandmother was reluctant to do so and she could not make Grandmother bring her.

Mother and Grandmother also explained the September 26 car chase that resulted in the police taking custody of Chrissy and turning her over to Father. Mother testified that, in the days prior to September 26, unknown persons would periodically knock on their door, ring the bell, call on the telephone, and run around the house yelling and banging on windows. She did not answer the door or the telephone out of fear. Mother said that this occurred five or six times, sometimes at night. Even though they were "very scared," they did not call the police. On September 26, an unknown person knocked on the door and rang the bell, and the telephone also rang. Mother was afraid, and Grandmother came home from work and looked around the neighborhood. Chrissy was scheduled to play with friends from the Florida home-school co-op, so Mother and Chrissy left for that. Since Chrissy liked Grandmother's Mustang, they took Grandmother's car. When the private investigator's vehicle came up behind the car Mother was driving, Mother said, she was "petrified." She said she did not know the people following her and Chrissy. During the car chase, she asserted, she was trying to get to the local mall, feeling that would be a safe place. When she inadvertently turned into a dead-end street, she was "very relieved" to see the police cars pulling up.

Mother asserted that since Father obtained custody of Chrissy, he had not been adequately tending to Chrissy's multiple health issues, including recurring bladder infections, problems with control of her bowel, and allergies.[4] Although Mother said she was "happy with" the school in which Chrissy was enrolled, she felt that Father did not adequately address Chrissy's educational needs.

During the hearing, the trial court required Mother to submit medical records to substantiate her claim that, while in Florida, she had become too ill to drive safely to Tennessee. The medical records from Florida in fact supported Mother's assertions of illness and went on to note that Mother needed psychotherapy to address depression and anxiety as well as to improve problem solving and coping skills. The Florida records stated that Mother should not drive under the medications prescribed. Father's counsel noted several statements in the medical records in which Mother described her situation and the source of her anxiety. Although some of the records described Mother as "visiting" Florida, other records said she had "moved" to Florida and described Mother's fears about Father. One record dated August 12, 2002 said: "She states that she came to Florida because she is afraid that the father will molest their daughter if he is allowed unattended visitation." A second note that day says: "She states that she recently moved to Florida with her daughter. . . ." A record dated September 6, 2002 noted: "She stated that she is doing her best to obtain legal advice

---

[4]Mother insisted that it was imperative that Chrissy begin taking Claritin at the "first onset" of allergy symptoms and stay on it several months, because Chrissy "has a history of having developed pneumonia from post-nasal drip."

while in Florida to prevent her daughter from being returned to her father in Tennessee." An entry on September 13, 2002 said: "She states that she came to Florida because she is afraid that the father will molest their daughter if he is allowed unattended visitation." Mother denied the accuracy only of the statements indicating that she had in fact moved to Florida.

At the conclusion of the hearing, the trial judge issued an oral ruling in which she clearly rejected Mother's innocuous explanations for her actions. In her ruling, the trial judge indicated that, when she had previously considered Mother's petition to move to Florida, she had suspected that the purpose behind the proposed move was to alienate Chrissy from Father, and that Mother's subsequent actions proved that this suspicion was correct. The trial court noted that, at that point, Mother could have sought to protect Chrissy by appealing the trial court's ruling, seeking a stay pending appeal and participating in the counseling ordered by the trial court, but that Mother chose not to do so. Instead, she moved out of her Tennessee home and in fact moved to Florida, despite Mother's protestations otherwise. The trial court pointed out that Mother did not provide documentation of any medical attention for her claimed illness prior to August 10, 2002, when she was already in contempt of court for not having returned Chrissy to Father for his visitation.

The trial court discredited Mother's and Grandmother's testimony in other respects. The judge noted that Grandmother had testified that Father "basically goaded her into cussing him out," and that the tape of the conversation "didn't sound at all like what she described." The trial court observed that both Mother and Grandmother maintained that numerous people had come to the home on several occasions banging on the door, and that they were afraid these unknown persons would attempt to snatch Chrissy. Despite this, the trial court pointed out that the police were not called and observed that an explanation for this behavior would be if Mother were "hiding out from the law or trying to avoid the police coming to the house to take the child . . . ."

The trial court granted Father's petition to be permanently designated the primary residential parent. In doing so, the trial court first reiterated its belief that Father was a caring parent who would not harm Chrissy and reviewed the evidence which supported this conclusion. The trial court next noted several changes in circumstances since the August 2 oral ruling which justified a permanent change in custody. These circumstances included: Mother giving up her home within the week of the original decision; a reduction in Mother's salary by almost half of the amount stated at the first trial; Mother's relocation to Florida with Chrissy in defiance of the trial court's order; and the actions by Mother and Grandmother to deprive Father of his court-ordered visitation rights. The trial court contrasted this with Father's actions since obtaining temporary custody of Chrissy, which were supportive of Chrissy's relationship with Mother.

The trial court also cited as a change in circumstance the deterioration of Mother's mental health. The trial court commented on Mother's demeanor during the trial:

[W]hen I look at her medical records, I can't tell any difference in the depression state and anxiety state from the date of August 10th, when this lady couldn't function, until now. This psychiatrist down in Florida—they were talking about her

-17-

being tearful at times and at other times displaying what they described as mood incongruent laughter. If you took this up to the Court of Appeals, it wouldn't show it. But [Mother] laughs at the wrong times, and that record is not going to show it.

The trial court emphasized that the change in custody was not punishment for Mother's contempt of court: "I just don't think she can be trusted with this child anymore. That really concerns me, this child's safety." The trial court granted Mother supervised visitation at Father's discretion.

On the contempt petition, the trial court found Mother guilty of fifteen counts of criminal contempt for the denial of Father's visitation and one count of criminal contempt for moving Chrissy to Florida in violation of the trial court's earlier order.[5] The trial judge was reluctant to put Mother in jail because Chrissy would think that Father had put Mother in jail. Consequently, although the trial judge sentenced Mother to ten days in jail for each of the fifteen counts regarding Father's visitation, she gave Mother the option, in lieu of jail, to pay Father restitution under section 29-9-105 of the Tennessee Code for the $14,800 in the private investigator fees that resulted from Mother's violation of the order forbidding her from moving with Chrissy to Florida. In the event that Mother paid the restitution to Father prior to serving the entire sentence, the trial court stated that it would suspend the remainder of Mother's jail sentence. The trial court also permanently designated Father as Chrissy's primary residential parent. Finally, because Mother had been found guilty of willful contempt, Father was awarded attorney's fees in the amount of $15,127.50. Mother now appeals.[6]

Mother lists several issues on appeal, including whether the trial court erred in first denying her request to relocate, granting Father unsupervised visitation, and permitting testimony about the marital relationship, and later finding Mother guilty of criminal contempt, designating Father as the primary residential parent, limiting Mother to supervised visitation,[7] awarding attorney's fees to Father, and ordering Mother to pay Father's private investigator fees.

---

[5]The original order on this matter was filed on January 30, 2003. However, the trial court amended the final order by way of a May 2, 2003 order modifying its holding on contempt and setting the amount of attorneys fees awarded to Father, an issue that had been reserved in the January 30 order. The May 2 order was filed after the record of this appeal had been filed with this Court. Mother therefore filed a motion to stay the appeal until the record was supplemented with the May 2 order. An order from this Court was filed June 25, 2003 noting that the record had been supplemented on June 18 and granting Mother fifteen days to file her brief. However, the order also states: "All other matters, including the effect of the post-judgment items contained in the supplemental record, are reserved pending completion of the briefing schedule and oral argument." We will therefore consider the May 2, 2003 order as though it had been filed with the original record.

[6]Although the trial court issued an oral ruling on August 2, 2002, the written order was not entered until September 3, 2002. Mother's notice of appeal of this order was filed on September 16, 2002. Mother also sought an extraordinary appeal pursuant to Rule 10 of the Tennessee Rules of Appellate Procedure, which was denied. The written order on the trial court's December 10, 2002 oral ruling was not entered until January 30, 2003, and Mother's notice of appeal was filed on February 28, 2003.

[7]Mother originally also appealed the trial court's decision leaving visitation at Father's discretion. This issue is moot in light of the trial court's post-judgment order establishing a court-ordered visitation schedule for Mother.

-18-

On appeal, we will presume the trial court's factual findings to be correct unless the evidence preponderates otherwise. Tenn. R. App. P. 13(d); *Huntley v. Huntley,* 61 S.W.3d 329, 334 (Tenn. Ct. App.1991). Decisions regarding visitation and custody are generally reversed only for abuse of discretion, as " 'the details of custody and visitation with children are peculiarly within the broad discretion of the trial judge.' " *Eldridge v. Eldridge*, 42 S.W.3d 82, 85 (Tenn. 2001) (citations omitted). Regarding the finding of criminal contempt against Mother, we "must review the record to determine if the proof adduced at trial supports the finding of the trier of fact of guilt beyond a reasonable doubt." *Levenhagen v. Levenhagen,* No. M1998-00967-COA-R3-CV, 2000 WL 1292446, at *7-*8 (Tenn. Ct. App. Sept. 14, 2000); *see* Tenn. R. App. P. 13(e); *Thigpen v. Thigpen,* 874 S.W.2d 51, 53 (Tenn. Ct. App.1993) (noting that, for contempt, an appellate court does not view the evidence in the light most favorable to the accused; rather, a finding of criminal contempt will be reversed only when the evidence does not support the conviction beyond a reasonable doubt). The trial court's punishment for contempt and its award of attorney's fees are reviewed for an abuse of discretion. *Aaron v. Aaron*, 909 S.W.2d 408, 411 (Tenn. 1995) (considering attorney's fees); *Hawk v. Hawk*, 855 S.W.2d 573, 583 (Tenn. 1993) (considering punishment imposed for contempt). As to the trial court's determinations regarding credibility, the weight, faith, and credit to be given to any witness's testimony lies in the first instance with the trial court, which has the opportunity to observe the witnesses' manner and demeanor while testifying, and the credibility accorded by the trial court will be given great weight by the appellate court. *In re Estate of Walton v. Young (In re Estate of Walton)*, 950 S.W.2d 956, 959 (Tenn. 1997). The trial court's conclusions of law are reviewed *de novo,* with no presumption of correctness. *Huntley,* 61 S.W.3d at 334.

We address first the trial court's decision to grant Father unsupervised visitation with Chrissy. Mother argues that the parties had in place an agreed-upon marital dissolution agreement and parenting plan which provided for supervised visitation for Father, and that in order to modify the visitation arrangement, the trial court was required first to find a material change in circumstances and then that the modification was in the child's best interest. She cites *Adelsperger v. Adelsperger*, 970 S.W.2d 482, 485 (Tenn. Ct. App. 1997). Mother maintains that the circumstances which warranted the supervised visitation still existed, and that Father's alleged sexual behavior toward Chrissy made it clear that removing the requirement of supervision for Father's visitation was not in Chrissy's best interest. Mother argues that Father's massages of Chrissy were cause for concern, that his games with Chrissy were inappropriate, and that Father tried to evade supervision during the visitation. She discusses selected portions of Dr. Dupree's testimony and report, emphasizing Dr. Dupree's statement that there was "information that suggests an increased risk for this child," and the discussion of the two incidents when Father was a teenager, one involving a younger child and another involving an interest in bestiality. She notes Dr. Dupree's statement that "whenever you see one sexually deviant behavior you're likely to see other sexually deviant behaviors." As to Father's massages of Chrissy, Mother points out Dr. Dupree's statement that it was not possible for her "to know if indeed his intent was sexual or grooming in nature."

As Mother knows well at this point, supervision of a parent's visitation with his or her child is a significant intrusion on the parent-child relationship. It is sometimes necessary in order to protect

the child yet permit continuation of the relationship. It is not to be undertaken lightly or without a reasonable basis.

Mother correctly points out that an agreed-upon parenting plan, incorporated into a court order, becomes *res judicata*. ***Adelsperger***, 970 S.W.2d at 485. Normally, modification of the agreed-upon designation of the primary residential parent and the allocation of parenting time calls for showing a material change in circumstances and that a modification will serve the child's best interest. ***Id.*** By its nature, however, supervision of a parent's visitation with a child must be viewed in a different context. Unlike, for example, the designation of the primary residential parent, such supervision is normally intended to continue only so long as there is a reasonable need for it. Other courts have noted that a trial court should modify the conditions of supervised visitation or end it altogether when "the allegations that necessitated the supervision are determined to be without 'credible evidence' . . . or . . . the noncustodial parent had demonstrated a clear ability to control the propensities which necessitated the supervision." ***Carter v. Carter***, 470 S.E.2d 193, 200 (W.VA. 1996) (internal citations omitted). As always, "the best interests of the children should determine the pace of any visitation modification to assure that the children's emotional and physical well being is not harmed." ***Id.***

Indeed, in this case, Mother does not dispute Father's testimony that the parties discussed the conditions under which the supervision of Father's visitation would end. They certainly disagree on the conditions that would have to be met in order to end the supervision, but there is no indication that the parties agreed that the supervision would continue until Chrissy reached majority.

Since supervision stems from the delicate balancing of protection of the child with preservation of the child's relationship with her parent, we are compelled to recognize that such decisions hinge on the trial court's assessment of the parties' credibility, specifically, whether the parent can be trusted to spend time alone with the child without violating the necessary boundaries. As we have noted above, such credibility determinations are peculiarly within the province of the trial court, and the appellate court must accord such credibility decisions great weight. ***See Walton***, 950 S.W.2d at 959.

In this case, the trial court heard exhaustive evidence on the issue of Father's alleged sexual proclivities, from the parties, numerous witnesses and even expert testimony. To Mother's dismay, the trial judge here found Father and the witnesses who testified on his behalf credible. The trial judge looked at Dr. Dupree's testimony in overall context, and found that it did not support Mother's assertion that Father was a threat to Chrissy's well-being. In assessing the credibility of Mother and the witnesses who testified on her behalf, the trial court found that Mother's reaction to Father's viewing of pornography had resulted in Mother convincing herself of phantom threats to Chrissy's safety that simply never existed. Making such credibility determinations with respect to the well-being of a child is perhaps a trial judge's most important responsibility, and the appellate court is obliged to accord great deference to its findings.

In this appeal, Mother rightly asks that her concerns about sexual abuse of her beloved daughter be taken seriously. This we must do. While we accord appropriate deference to the trial

court's assessment of the witnesses' credibility, we are also obliged to examine the record independently and review the trial court's decisions carefully. This, likewise, has been done. After reviewing the evidence in detail, we cannot disagree with the trial court's decisions to grant Father unsupervised visitation.

Viewed as a whole, the evidence simply does not support Mother's conclusion that Father's viewing of pornography as their marriage disintegrated and the isolated incidents that occurred when he was a teenager mean that Father has engaged in sexually inappropriate behavior with their daughter or that he is likely to engage in such behavior. The trial judge found that the games and massages were appropriate parental behavior, and we cannot disagree. This is corroborated by the testimony of Father's first wife and his son, Ben, both found credible by the trial court. Even Dr. Dupree's testimony and report, although heavily relied upon by Mother, when viewed in total context, does not support her assertion that Father's time with Chrissy should be supervised.

Indeed, the evidence strongly supports the trial court's conclusion that Mother's hypervigilance regarding Father's alleged sexual abuse of Chrissy has done real harm to Chrissy. Mother's overreaction resulted in Chrissy being treated as a survivor of sexual abuse, without any evidence that such abuse had occurred. Mother watched Father's every move around Chrissy, signaling disapproval at indications of normal physical affection, frequently asking Chrissy if Father had touched her inappropriately and making it clear to Chrissy that Mother's fear of such sexual misconduct was the reason his visitation was supervised. Chrissy was even brought to the Rape and Sexual Abuse Center for counseling as a sexual abuse victim. In her testimony, Dr. Dupree acknowledged but downplayed any risks regarding Father. However, she unequivocally said that Mother's exaggerated response was unhealthy for Chrissy and would likely result in future accusations of sexual abuse, regardless of whether there was any basis for such accusations.

With deference to the trial court's determinations of credibility, we cannot find that the trial court erred in granting Father unsupervised visitation, in concluding that Chrissy should not be treated as a sexual abuse survivor when no such abuse had occurred, and in determining that Father and Chrissy should be permitted to have a normal father-daughter relationship. The trial court's decision to award Father unsupervised visitation is affirmed.

Mother also argues that, during the first hearing on whether Father's visitation should be supervised, the trial court erroneously permitted Father to testify about events that occurred in the marriage. Clearly this testimony was appropriate to give necessary background for the parties' agreed-upon parenting plan. This issue is without merit.

Next, Mother contends that the trial court erred in refusing to permit her to relocate to Florida with Chrissy. The trial court initially concluded that there was no reasonable purpose for Mother's proposed move and that there was a threat of serious harm to Chrissy from the move, namely, the destruction of her relationship with Father. The trial court reserved any ruling on the issue of whether the relocation was proposed for a vindictive purpose. Later, in the course of the hearing on Father's

petition for contempt, the trial court concluded that Mother had in fact proposed the move to Florida for a vindictive purpose.

The trial court reasoned that Mother was in a comfortable position in Tennessee even if Grandmother no longer lived with them. It was undisputed that Mother was not financially dependent on Grandmother. The trial court also considered the almost certain destruction of Chrissy's relationship with Father, already burdened by Mother's overreaction to Father's viewing of pornography and Mother's resulting hypervigilance regarding sexual abuse. We cannot disagree with this conclusion. Mother's conduct indicated that, despite her protestations otherwise, she did not appropriately value Chrissy's relationship with her father, even going so far as to testify that she believed that Chrissy's relationship with Grandmother was as important as Chrissy's relationship with Father. The trial court rightly concluded that a move to Florida would likely result in the destruction of the father-daughter relationship.

Moreover, as discussed more fully below, the trial court did not err in concluding that the relocation to Florida was proposed for a vindictive reason. The proposed move followed closely on the heels of Father's request that the restrictions on his visitation be removed, and Mother's actions prompting the contempt hearing show that, in moving to Florida, Mother intended to seriously damage, if not destroy, Chrissy's relationship with Father. Therefore, the trial court's decision not to permit Mother to relocate to Florida with Chrissy is affirmed.

We next address the trial court's finding that Mother was in contempt of court for both preventing Father from having his visitation with Chrissy and for moving to Florida with Chrissy. Section 29-9-102(3) of the Tennessee Code provides that the trial court has the power to hold a party in contempt of court for "[t]he willful disobedience or resistance of any . . . party . . . to any lawful . . . order . . . of such courts." Tenn. Code Ann. § 29-9-102(3) (2000). Mother argues that her failure to return Chrissy to Father for the court-ordered visitation could not be considered willful under the statute, because she intended to return Chrissy to Tennessee for her visitation but was physically unable to do so. She also argues that the evidence does not support the trial court's finding that she in fact moved to Florida with Chrissy.

The undisputed evidence shows that within days of the order granting Father unsupervised visitation, Mother leased her Tennessee home and gave up possession of it, left for Florida without any arrangements for housing upon return to Tennessee, took many of Chrissy's belongings, including her school books, involved Chrissy in a Florida home school coop program, and lived with Grandmother in a Florida home purchased in her own name. The only documentary evidence offered by Mother that she even considered returning to Tennessee was a letter offered by Mother showing acceptance to a Tennessee home school program, dated August 27, 2002, nearly a month after Mother and Chrissy arrived in Florida and eighteen days after Chrissy missed her first unsupervised visitation with Father. All of this indicates Mother intended from the beginning to stay in Florida indefinitely.

Mother insists that her failure to bring Chrissy back to Tennessee was caused by her illness, which was documented, and that consequently it was not intentional, which is required for a finding

of contempt. Indeed, the evidence shows that Mother was in fact ill, but it also indicates clearly that Mother's illness resulted from her intense anxiety at having to turn Chrissy over for unsupervised visitation with Father. Mother's statements to medical professionals, as well as Grandmother's observations of Mother becoming ill at the prospect of returning Chrissy to Tennessee, demonstrates this. Mother appears to argue that she should have been permitted to keep Chrissy in Florida with her indefinitely or at least until she was no longer sickened by the prospect of Father visiting unsupervised with Chrissy. But after hearing exhaustive evidence, the trial court found that Mother's fears, however real, were without basis; Mother was bound by law to accept and abide by the trial court's ruling, and failed to do so.

Despite rather implausible testimony by both Mother and Grandmother that they were supportive of Chrissy's relationship with Father, their conduct belied this. For many of Father's telephone calls to Chrissy, Mother and Chrissy were gone, although Mother ostensibly was too ill to bring Chrissy to Tennessee or even to bring her to the airport to meet Father. Mother did not testify about any efforts by her to call Father back when he left messages. On a telephone call from Father when Chrissy and Mother happened to be home, Mother yelled to Chrissy, do you want to speak to your father? Chrissy, of course, dutifully responded no, and this charade was repeated for emphasis. In an astonishing display of cruelty, Grandmother told Father that Chrissy was not there "anymore," that she did not have "the foggiest idea" where they were, and called him vile names for having the temerity to question her about his daughter's whereabouts. Grandmother, of course, returned to Tennessee to retrieve yet more furniture but gave no consideration to bringing Chrissy for her court-ordered visitation. When Father made arrangements to travel to Florida to get Chrissy, accompanied by his pastor because of his justifiable concerns over what Mother might do, Mother called church officials and threatened legal action against the church if they supported Father's efforts to see his daughter. When the Florida sheriff's deputy came to Grandmother's house to serve her with an order, she said she was afraid to come to the door because a group of unknown persons had been coming to the home at odd hours, banging on the door, ringing the bell, calling on the telephone and even banging on windows and yelling outside. Despite this, no law enforcement officials were called. Both Mother and Grandmother offered a variety of fallacious explanations for this conduct, which the trial court rightly and categorically rejected. The evidence in the record clearly supports the trial court's finding of criminal contempt, including the requisite intent, beyond a reasonable doubt, and the finding of contempt is affirmed.

Next, Mother challenges the trial court's modification of the original parenting plan to designate Father as the primary residential parent. A change of custody may be made if there has been a material change in circumstances and if the modification is in the child's best interests. *Adelsperger*, 970 S.W.2d at 485. When determining whether there has been a change in material circumstances, courts should consider whether "the change 'has occurred after the entry of the order sought to be modified,' the change 'is not one that was known or reasonably anticipated when the order was entered,' and the change 'is one that affects the child's well-being in a meaningful way.' " *Kendrick v. Shoemake*, 90 S.W.3d 566, 570 (Tenn. 2002) (citations omitted). Further, a *parent's* change in circumstances may justify a change in custody if the change affects the child's well-being. *Id.* A material change in circumstances may also include a parent's failure to follow the parenting

plan. Tenn. Code Ann. § 36-6-101(a)(2)(B) (Supp. 2002). The determination of whether the change in custody is in the child's best interests should be made according to the factors set out in Tennessee Code Annotated section 36-6-106. **Kendrick**, 90 S.W.3d at 570. These factors include the parents' mental and physical health and the willingness and ability of each parent to facilitate and encourage a relationship with the other parent. Tenn. Code Ann. § 36-6-106 (2001).

Mother argues that, even if she is found to be in contempt of court, her prolonged stay in Florida was not a sufficient change in circumstance to warrant a change in custody, and that a change was not in Chrissy's best interest. The trial court correctly found that Mother had in fact moved to Florida, and this was ample justification for designating Father as the primary residential parent. However, the trial court did not rely on this as the basis for its decision. Rather, the trial court based its decision on other changed circumstances, such as the fact that Mother had given up possession of her Tennessee home, with no replacement Tennessee home, without informing anyone; that Mother testified that she was only making half as much money as a medical transcriptionist; and that Mother's parenting decisions were poor, such as suggesting to Chrissy that she throw a temper tantrum in a public place if Father resisted letting Chrissy call Mother. Most importantly, the trial court based its decision on Mother's deteriorated mental health, laid out clearly in the Florida medical records Mother introduced into evidence to show her inability to return Chrissy to Tennessee for visitation. The trial court observed that there was no evidence that Mother's mental state had improved and that in fact Mother's demeanor in court, such as mood incongruent laughter, indicated that her mental and emotional condition remained unstable. The trial court also based its decision on the behavior of both Mother and Grandmother in Florida, clearly directed toward alienating Chrissy from Father and making it impossible for him to see her, and the trial judge's justifiable conclusion that Mother could not be trusted with Chrissy. The trial court contrasted this with Father's conduct since receiving custody of Chrissy, which was to facilitate Chrissy's relationship with Mother:

> [Father] actually let her talk to this child within 24 hours after he's finally gotten to see this child for the first time in six weeks, which amazes me. It shows me which parent has the best parenting skills, which parent is not going to alienate the child, [Father].

All of this evidence supports the trial court's finding of a material change in circumstances.

Mother argues that a change of custody is not in Chrissy's best interest, because Father represents a continued threat of abuse to Chrissy, and because Father neglects Chrissy's many health issues. Mother's argument that Father represents a continued threat of sexual abuse is discussed above and must be rejected. Mother argues that, after having obtained custody of Chrissy, Father neglects Chrissy's medical needs. This argument must be rejected as well. Although Father does not duplicate Mother's near-obsessive attention to Chrissy's health issues, the evidence does not support Mother's assertion that this difference in parenting constitutes neglect. Overall, the evidence overwhelmingly supports the trial court's designation of Father as the primary residential parent, and it is affirmed.

Mother next appeals the trial court's requirement that her visitation be supervised. Mother clearly remains convinced that Father is a danger to Chrissy, and that her actions in keeping Father from Chrissy were in Chrissy's best interest. Mother to this day fails to understand how her conduct deprives Chrissy of a normal parental relationship with either her father or her mother. Generally, the details of visitation with children are within the broad discretion of the trial judge and will be reversed only on a showing that the trial judge abused that discretion. *Eldridge*, 42 S.W.3d at 85. The trial judge in this case found that Mother's conduct demonstrated that she could not at this point be trusted with unsupervised visitation of Chrissy. Sadly, the evidence fully supports this conclusion. Finding no abuse of discretion, we affirm the trial court's requirement that Mother's visitation with Chrissy be supervised.

Mother argues next that it was an abuse of discretion for the trial court to award Father the $14,800 in private investigator fees he incurred to retrieve Chrissy in Florida, under Tennessee Code Annotated section 29-9-105. Mother argues that Father did not plead these fees as damages and that they were therefore improper under Rule 9.07 of the Tennessee Rules of Civil Procedure. However, our review of the record indicates that Mother failed to raise this issue at trial. Issues not raised at trial may not be argued on appeal. *Simpson v. Frontier Credit Union*, 810 S.W.2d 147, 153 (Tenn. 1991). Moreover, the trial court assessed these fees against Mother as an alternative to her spending 10 days in jail for each of the fifteen counts of criminal contempt, a total of 150 days in jail. The trial court did this apparently because Mother had told Chrissy that Father was attempting to have her put in jail, and the trial judge did not want Father blamed because Mother chose to defy the trial court's order and place herself in contempt of court. We see no error in the trial court's decision, and it is affirmed.

Mother also appeals the award to Father of $15,127.50 in attorney's fees, accrued after Mother took Chrissy to Florida.[8] Our review of the affidavit of Father's counsel's confirms the trial court's conclusion that the attorney's fees were reasonable and necessary in this case. The contempt and change of custody proceedings were necessitated by Mother's failure to return Chrissy for Father's visitation. The trial court decision to assess attorney's fees against Mother was not an abuse of discretion, and it is affirmed as well.

The decision of the trial court is affirmed. Costs of this appeal are taxed to Plaintiff/Appellant B. M. M. and her surety, for which execution may issue if necessary.

 

_____
HOLLY M. KIRBY, JUDGE

---

[8] As discussed *supra* note 5, although the trial court's May 2, 2003 order setting attorney's fees was added to the record on appeal, the order is given full effect. Mother inexplicably reserved argument on the issue of attorney's fees. No further briefing is necessary or permitted on the issue of attorney's fees.